**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CARMELLA RICE,**

               **Plaintiff,**

    **v.**                               **Civil Action 2:19-cv-3497**
                                            **Judge George C. Smith**
                                            **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

               **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Carmella Rice, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 11) be **OVERRULED** and that judgment be entered in favor of Defendant.

## I.      BACKGROUND

Plaintiff filed her application for DIB on November 25, 2013, alleging that she was disabled beginning November 26, 20012. (Tr. 172–73). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on September 14, 2016. (Tr. 34–75). On November 8, 2016, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 16–26).

The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3–7). Plaintiff then filed a case in this Court. (*See* Southern District of Ohio, 2:17-cv-747). On March 5, 2018, Judge Edmund A. Sargus, Jr. remanded the case back to the administrative level. (Tr. 1316).

A second administrative hearing was held on February 12, 2019. (Tr. 1250–83). On April 9, 2019, the ALJ issued a partially favorable decision. (Tr. 1217–32).

In lieu of appealing to the Appeals Council, Plaintiff filed the instant case on August 12, 2019 (Doc. 1). This matter is now ripe for resolution. (*See* Docs. 8, 11, 13, 14).

## A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's testimony at her two administrative hearings:

At the September 2016 ALJ hearing, the claimant testified that her main barriers to employment were sleepiness, weakness, and dizziness. She said that her right knee hurt and that she was currently walking with a cane after her partial knee replacement a month prior. She said that she had swelling from head to toe and that she fell due to dizziness. She said that she had carpal tunnel surgery in both hands, but that her right hand continued to lock up. She said that she had fibromyalgia which worsened throughout the day.

At the February 2019 hearing, the claimant testified that she was four feet, ten and one-half inches tall, and weighed 182 pounds. She said that she became dizzy when walking and sometimes became fatigued. She said that she had severe body aches and a feeling of shock going through her toes. She indicated that knee replacement had not helped her knee pain. She said that she had neck and back pain. She said that she had poor memory. She said that she had a history of carpal tunnel surgery, still dropped things, and was unable to open containers. She said that on bad days she was in bed all day. She said that she had had a cane since 2016 when she had surgery. She said that she frequently used the restroom.

(Tr. 1225).

## B. Relevant Medical Evidence

Again, the ALJ provided a useful overview of the relevant medical history in this matter.

### 1. Physical Health

In terms of the claimant's various alleged pain and degenerative arthritis related conditions, at the time of her alleged onset date she was treating with Rodney Green, M.D., for carpal tunnel syndrome, and electrodiagnostic testing confirmed carpal tunnel syndrome, leading Dr. Green to prescribe splints and recommend future surgery should the symptoms persist (Exs. 1F and 3F).

April and May of 2013 x-rays revealed early osteoarthritis of the claimant's right knee and degenerative disc disease of her cervical and lumbar spine (Ex. 7F/60,

61).  During this time, she was treating with Catherine Lee, M.D., who had diagnosed lupus erythematosus and fibromyalgia (Ex. 7F/39).  However, Dr. Lee noted that the claimant's ANA labs were in the normal range, and all other lab results were negative (Ex. 7F/2).  In April 2013, Dr. Lee noted that the claimant did have some reduced motion in her right knee and the tender points associated with fibromyalgia, but she had a normal gait and full range of motion in all other extremities (Ex. 7F/38).  Dr. Lee was treating the claimant's pain symptoms with Cymbalta (Ex. 7F/39).

Dr. Lee continued to treat the claimant's pain symptoms, adding Flexeril, Neurontin, and trigger point injections, and recommending stretches (Ex. 7F/9, 27).  Nonetheless, the claimant continued to complain of diffuse pain that was a "10" on a scale of 1 to 10 (Ex. 7F/l7).  In August 2013, she had surgery to correct her right carpal tunnel syndrome, and subsequently attended physical therapy (Exs. 6F and 7F/14).  She was happy with the results, and told Dr. Lee that the procedure "went well" (Ex. 7F/2).

The claimant also treated with Lisa Mewhort, M.D., who noted in July 2013 that the claimant's lupus symptoms were "very well controlled" and reported that although the claimant was not physically active, she "does heavy housework, can walk up several flights of stairs without symptoms" (Ex. 8F/12).  In December 2013, Dr. Mewhort cleared the claimant for left carpal tunnel surgery, and noted that the pain in her right hand was better, but that her thumb continued to hurt (Ex. 8F/2).  The left carpal tunnel release proceeded without incident on December 17, 2013 (Ex. 9F).

In January 2014, the claimant continued her medication regimen and injection therapy with Dr. Lee (Ex. 12F).  She also underwent chiropractic adjustments after being involved in a car accident in late December 2013 (Ex. 13F), but told Dr. Mewhort in March 2014 that her carpal tunnel issues were resolved, and she was "looking forward to going back to work" (Ex. l5F/2). Dr. Lee noted later that month that the claimant's pain had been stable, but that she had a recent flare after starting aquatic therapy.  Dr. Lee noted that the claimant was "very deconditioned," and that the exercise triggered a flare.  Dr. Lee recommended a cortisone injection and cautioned the claimant to slowly increase her level of exercise (Ex. 16F/2).

The claimant continued conservative treatment with Drs. Lee and Mewhort.  A June 2014 exam showed a normal musculoskeletal and neurological study, and lab work continued to show ANA values in the normal range.  Nonetheless, the claimant alleged that her pain level was an "8/10" (Ex. 20F), but at a gynecological appointment the following day with Shivkamini Somasundaram, M.D., the claimant reported that she was no longer having any pelvic pain she had previously reported, and had "been doing well overall" (Ex. 21F/2).  Thus, there are examples in the record that demonstrate that the claimant has been inconsistent in her reporting of pain symptoms.  In June 2014, she stood four feet, eight inches tall, and weighed 195 pounds, consistent with a body mass index (BMI) of 40.06, which

is defined as Level III, or extreme obesity, per the National Institutes of Health Guidelines identified in SSR 02-lp (Ex. 22F/2).

The claimant's carpal tunnel syndrome continued to improve. In December 2014, her surgeon, Dr. Green, noted only "fairly minor" triggering in her right hand, and a "good response" to the injections and surgery (Ex. 29F/3). The claimant continued to see Dr. Lee for her all-over complaints of pain, and Dr. Lee tried a variety of medications, including gabapentin and Lyrica, but the claimant reported no change in her pain and fatigue. Dr. Lee continued to note tender points and a diagnosis of fibromyalgia, but no significant musculoskeletal or neurological abnormalities (Ex. 31F). February and March 2015 exams revealed that the claimant was well appearing, very pleasant, and in no acute distress, with full musculoskeletal range of motion with no tenderness of palpation, no synovitis, and no erythema (Ex. 32F/3, 6, 7).

In September 2015, the claimant established care with Kenneth Ecker, M.D., who continued the claimant's regimen of Lyrica and Cymbalta, and, after a physical exam, Dr. Ecker reported some concerns over a conversion disorder (Ex. 34F/7). Dr. Ecker's notes indicated that the claimant had at times had periods of activity that were significantly greater than she had generally reported. For example, in October 2015, the claimant told Dr. Ecker that she was vacuuming her car at a car wash when she tripped and fell (Ex. 34F/1). The claimant suffered a sprain to her right fingers following this incident, and underwent a short course of physical therapy (Ex. 36F).

The claimant went to the emergency room on two occasions in 2016 with complaints of pain and fatigue, but on each occasion results of her blood work were unremarkable (Exs. 38F and 39F). Records from Drs. Lee and Ecker showed that the claimant continued her reports of pain and fatigue, but had stated that the combination of Lyrica and Cymbalta "have helped a bit" (Ex.41F/5). In June and July 2016, the claimant visited Mark Gittins, D.O., due to increased pain in her right knee, but she had no assistive device and stable balance (Exs. 42F/l and 54F/5). Despite reporting a pain level of 10, she was alert, oriented, and conversant, with a normal mood and affect (Ex. 54F/5). A July 2016 treatment note did not indicate high activity of lupus; rather, complement levels were normal (Ex. 50F/50). Even well after the established disability onset date, electrodiagnostic testing revealed only borderline to mild right sided carpal tunnel syndrome (Ex. 50F/92).

(Tr. 1225–27).

### 2. Mental Health

In January and July 2014, she reported that she lived in an apartment with family, slept in, watched television, showered, dressed, picked up her husband from work, watched more television, spent time with her husband, bathed, and retired to bed around 1:00 AM. (Exs. 4E/l and 6E/l). She alleged impaired memory (Exs. 4E/l,

3 and 6E/l, 3). She reported that she cooked simple meals daily but struggled to follow recipes (Exs. 4E/3 and 6E/3). She reported that she cleaned one load of laundry every two weeks, wiped the sinks out twice a week, went outside four to six days a week, drove a car, rode in a car, shopped once a week for 15 minutes, and could go out alone, pay bills, count change, handle a savings account, and use a checkbook (Exs. 4E/4, 5 and 6E/4, 5). She reported that she struggled to stay focused on a television show for more than one hour (Exs. 4E/6 and 6E/6). She reported that she spent time with her husband daily, that her daughter visited her on weekends, and that she talked to her family on the phone a few times a week (Exs. 4E/6 and 6E/6). She denied having any problems getting along with family, friends, neighbors, or others (Exs. 4E/6 and 6E/6). She reported that she did not have difficulty getting along with authority figures or handling changes in her routine but did not handle stress very well (Exs. 4E/9 and 6E/9).

In February 2014, psychologist Sudhir Dubey, Psy.D., evaluated the claimant and diagnosed depressive disorder in partial remission (Ex. 14F). Dr. Dubey observed that the claimant drove herself to the evaluation, arrived early, and was appropriately dressed, calm, friendly, coherent, logical, alert, responsive, and fully oriented. The claimant did not need multistep directions or multistep questions repeated, and she did not appear to have problems with comprehension. Trouble concentrating was not observed. Her recall of past experiences and recent events was normal. She displayed low average cognitive functioning. She reported independently washing, up, showering, changing clothes, shopping for personal items, driving, and doing paperwork.

She reported needing assistance from her husband with managing money, caring for pets, managing medications, managing a daily schedule, and keeping appointments. She reported at least daily activities with some family members, spending weekends with her daughters, interacting once a week by phone with her grandchildren, and interacting with acquaintances and neighbors on a monthly basis. The information she provided indicated that she could manage her own benefits.

In March 2014, the claimant was alert and oriented and had a normal mood and affect (Ex. 15F/3). In April, May, and June 2014, she had no depression, anxiety, or agitation, and she was fully oriented (Exs. 18F/16, 20; 21F/4; and 27F/5). Elsewhere in June 2014, she had poor insight and judgment, but an appropriate mood, affect, and appearance, and she was fully oriented (Ex. 20F/5).

In August, September, and October 2014, she was pleasant, alert, and oriented, and she had a normal mood and affect (Ex. 25F/l, 4, 7). Another October 2014 treatment note indicated no depression or anxiety (Ex. 27F/2). In February 2015, she was well appearing, very pleasant, alert, and oriented, and she had a normal mood and affect (Ex. 32F/6, 7). In April 2015, she was well developed, well nourished, awake, alert, and fully oriented, with intact language (Ex.32F/ll). In

September and October 2015, she was pleasant and in no acute distress (Ex. 34F/2, 6).

November 2015 and February 2016 review of systems were negative for anxiety, depression, and insomnia, and on exams she had an appropriate mood and affect, and was fully oriented (Exs. 35F/2 and 37F/3, 4). From February 2016 to April 2016, she engaged in work activity (Ex. 13E/2). In April 2016, she was cooperative and had an appropriate mood and affect (Ex. 39F/9). In June 2016, she was fully oriented and had an appropriate mood and affect, good insight and judgment, and normal cognition and memory (Ex. 40F/3). In July 2016, just prior to her established disability onset date, she had a normal mood and affect, and she was alert and oriented (Ex. 54F/5).

In September 2016, the claimant testified that she lived with her husband, daughter, her daughter's fiancé, and her grandson, age eight. She said that she dropped her grandson off and picked him up from school but lay down from 9:00 AM. to 2:30 P.M. She said that she had intermittent problems with memory. She indicated that she showered daily and took her medications.

In February 2019, the claimant testified that she lived with her husband, daughter, grandson, and daughter's boyfriend. She reported that she had been working in 2016, and stopped because of physical illness, not due to a mental impairment. She said that she was forgetful. She said that she sometimes attended her grandchildren's events. She indicated that she grocery shopped with an electric cart.

The summarized evidence supports a finding of no more than "mild" limitation to the functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.

(Tr. 1221–22).

## C. The ALJ's Decision

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability of November 26, 2012. (Tr. 1219). After careful review of the evidence, the ALJ found that Plaintiff was not disabled prior to August 2, 2016, but became disabled on that date and has continued to be disabled through the date of the ALJ's decision. (Tr. 1218). The ALJ found that, since her alleged onset date of disability, Plaintiff has had the following severe impairments: obesity, lupus, fibromyalgia, degenerative disc disease of her

cervical and lumbar spine, bilateral carpal tunnel syndrome, and degenerative joint disease of her knees. (Tr. 1220). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 1223). Further, the ALJ found "no more than 'mild' mental health limitations." (Tr. 1222). And, upon review of the evidence, the ALJ found the record did not support the extreme levels of pain asserted by Plaintiff. He explained:

> Consistent with the above summarized evidence, the claimant had some limitations due to her pain and arthritis-related conditions. However, the objective evidence does not support the extreme levels of pain that she alleged, and she described some relief from her symptoms with surgery, injections, and medication therapy. In addition, she had been inconsistent in her reports of pain levels, as well as reports of her activities of daily living. Moreover, the record indicates that her allegedly disabling impairments of fibromyalgia and lupus were present at approximately the same level of severity prior to the alleged disability onset date. The fact that these impairments did not prevent her from working at that time strongly suggests that it would not have precluded her from working at the sedentary exertional level. Nonetheless, I have attempted to accommodate her remaining symptoms by limiting her to work at the sedentary exertional level, with the additional postural and manipulative restrictions described in the residual functional capacity. In so doing, I have also taken into consideration her obesity with respect to the residual functional capacity found herein and how her obesity may have affected her other impairments. However, as noted above, she retained the ability to perform the work as described above, since her examination findings were generally relatively unremarkable.

(Tr. 1227).

> As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> Prior to August 2, 2016, the date the claimant became disabled, she had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could frequently handle and finger, occasionally climb ramps and stairs, and occasionally balance and stoop, but never crawl or climb ladders, ropes, or scaffolds. She needed to avoid hazards.

(Tr. 1224).

The ALJ then turned to the opinion evidence. Relevant here, the ALJ considered the opinion of Dr. Dubey, who performed an independent psychological evaluation of Plaintiff, and

found that Plaintiff would have no difficulty with multistep instructions, could maintain adequate attention, and would have no issues dealing with coworkers or supervisors but would have some issues dealing with work pressures and would be unable to maintain persistence and pace in order to remember and carry out multistep instructions independently due to attention, concentration, and memory problems, but could perform these tasks with supervision. (Tr. 1228). The ALJ assigned "partial" weight to this opinion, explaining that he "accepted his assessment except for his indication" regarding inability to maintain persistence, pace, or remembering or multistep instructions, explaining that "his own clinical evaluation findings do not support these conclusions, nor does the longitudinal record, which as summarized in Finding 3, documented routinely normal mental status functioning even at times of mental symptomatology." (*Id.*).

Next the ALJ considered the opinion of Plaintiff's treating physician, Dr. Green, who opined on a check-the-box form that Plaintiff has a number of physical limitations. (Tr. 1228–29). The ALJ afforded little weight to the opinion, explaining that it is inconsistent with Dr. Green's own treatment notes and because the form was "generated by the claimant's representative, and was quite leading in that it defined 'moderate' pain as pain that eliminates skilled work," which "is not in accord with the Social Security rules and definitions." (Tr. 1228).

## II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff asserts that the ALJ erred in his treatment of the opinion evidence. Specifically, she contends that the ALJ failed to provide good reasons for according less than controlling weight to her treating physician, Dr. Green. (*See* Doc. 11 at 14–17). In addition, Plaintiff asserts that the ALJ improperly evaluated the opinion of consultative examiner, Dr. Dubey. (*See id*. at 8–13).

### A. Dr. Green's Opinion

Plaintiff's treating physician, Dr. Green completed a form regarding Plaintiff's physical limitations. (Tr. 788–89). On it, he listed Plaintiff's diagnoses and opined that Plaintiff could "occasionally" lift/carry zero to five pounds but could "never" lift anything over that weight. (Tr. 788). He checked a box stating that Plaintiff has "moderate" pain, which the form defines as "constitut[ing] a significant handicap with sustained attention and concentration would eliminate skilled work tasks." (Tr. 789). When asked to "describe [his] clinical examination findings and provide the results of any objective testing performed," Dr. Green stated simply, "see notes," seemingly referring to his treatment records of Plaintiff. (Tr. 788).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

But all treating physicians' opinions are not created equally. And some courts within the Sixth Circuit have even questioned whether "check-the-box" opinions, like Dr. Green's, qualify as "medical opinions" as defined by the Regulations. *See Regier v. Comm'r of Soc. Sec.*, No. 1:17-CV-683, 2018 WL 4610692, at *6 (W.D. Mich. Sept. 26, 2018) (citation omitted) (noting that "form report does not constitute a medical opinion which is entitled to any particular deference or to which the treating physician doctrine even applies"). Consequently, courts have grown increasingly skeptical of the probative value of these forms, and "[t]he Sixth Circuit has explained that an ALJ may properly discount a treating physician's opinion when the opinion is in the format of a conclusory checkbox questionnaire." *Yoder v. Saul*, No. 1:18-CV-1831, 2019 WL 4451379, at *11 (N.D. Ohio Sept. 17, 2019) (citing *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) (finding that ALJ may properly afford little weight to treating physician's two-page check-off form that did not cite to objective medical evidence)).

These courts recognize that "[f]orm reports in which a doctor's obligation is only to check a box, without explanations of the doctor's medical conclusions are weak evidence at best." *Collins v. Comm'r of Soc. Sec.*, No. 2:18-CV-53, 2019 WL 4645737, at *8 (W.D. Mich. Aug. 30, 2019) (quotation marks and citation omitted) *report and recommendation adopted*, No. 2:18-CV-53, 2019 WL 4643807 (W.D. Mich. Sept. 24, 2019); *see also Dillon v. Comm'r of Soc. Sec.*, No. 1:18-CV-02681, 2019 WL 4279120, at *7 (N.D. Ohio Sept. 10, 2019) ("Even in cases where the ALJ has not specifically noted the check-box form of a treating physician's opinion, the Sixth Circuit has upheld a decision affirming the ALJ's decision on such a form.").

That is what we have here. Indeed, the only words on Dr. Green's form are his list of Plaintiff's diagnoses and his direction to "see notes." (*See* Tr. 788). The ALJ did not err in concluding that this was insufficient to support Dr. Green's opined limitations. *See Laporte v.*

*Comm'r of Soc. Sec.*, No. 1:15-CV-456, 2016 WL 5349072, at *7 (W.D. Mich. Sept. 26, 2016) (quotation marks and citation omitted) ("In such cases, where the physician includes remarks on a check-off form such as noting that the plaintiff's impairments consisted of severe peripheral vascular disease, coronary artery disease, COPD, depression and anxiety, these types of cryptic remarks are not sufficient to explain the doctor's findings."). Therefore, while Plaintiff contends that the ALJ was required to compare Dr. Green's opinion to the record, the Court notes that it would have been difficult if not impossible for him to do so without any substantive explanation from Dr. Green supporting his opinion. *See Lawson v. Berryhill*, No. CV 6:18-175-DCR, 2018 WL 6257105, at *6 (E.D. Ky. Nov. 29, 2018) (noting that it is "extremely difficult" to rely on or analyze the consistency of a "conclusory" check-the-box form that "is not accompanied by any explanation").

Even so, the ALJ did the best he could. He compared Dr. Green's limitations with Dr. Green's own treatment notes to see if they supported his findings. He found they did not. Specifically, he noted that Dr. Green's "office notes prior to filling out this form indicated that the claimant had 'fairly minor' triggering in her right hand, and a 'good response' to the injections and surgery." (*Id.* (citing Tr. 790)). Indeed, at that appointment, Dr. Green noted that Plaintiff was "considering going back to work" and that "[n]o further intervention [was] planned at [that] time." (Tr. 790). Regardless, the ALJ "attempted to accommodate Dr. Green's opinion that the claimant could occasionally lift 5 pounds" by limiting Plaintiff to work at the sedentary exertional level. (Tr. 1228–29). And while Plaintiff states that "[j]ust because [her] condition was 'improving' does not mean that she was able to lift greater than 5 pounds," (Doc. 11 at 17), Dr. Green does not support that limitation with an explanation or specific reference to treatment notes. The ALJ

reasonably concluded, therefore, that "[t]here [was] simply no evidence [] that [she] could not occasionally lift ten pounds." (Tr. 1229).

In sum, the ALJ had little to work with when reviewing Dr. Green's opinion, and Plaintiff has failed to show that the ALJ committed reversible error.

## B. Dr. Dubey

Next, Plaintiff contends that the ALJ failed to properly evaluate the opinion of Dr. Dubey, who was hired by the Social Security Administration to evaluate Plaintiff's mental health. (Doc. 11 at 8).

Dr. Dubey opined that Plaintiff would have no difficulty with multistep instructions, could maintain adequate attention, and would have no issues dealing with coworkers or supervisors. (*See* Tr. 573–80). But he also found that Plaintiff would have some issues handling work pressures, would be unable to maintain the persistence and pace necessary to remember and carry out multistep instructions independently due to attention, concentration, and memory problems but would be able to perform those tasks with supervision. (*See id.*).

Because Dr. Dubey saw Plaintiff only once, he is a "non-treating (but examining)" source. *O'Neil v. Comm'r of Soc. Sec.*, No. 2:19-CV-2966, 2020 WL 415611, at *5 (S.D. Ohio Jan. 27, 2020) (citing *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015)). His opinion is, therefore, not entitled to controlling weight. Rather, the ALJ should consider relevant factors, including supportability, consistency, and specialization. *O'Neil*, 2020 WL 415611, at *5 (citing 20 C.F.R. § 404.1502). Importantly, however, there is no "reasons-giving requirement" for non-treating source opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016). Instead, the ALJ must provide only "a meaningful explanation regarding the weight given to

particular medical source opinions." *Mason v. Comm'r of Soc. Sec.*, No. 1:18-cv-1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2).

The ALJ did that here. In assigning Dr. Dubey's opinion "partial weight" the ALJ accepted all of Dr. Dubey's opinion apart from several findings. (Tr. 1228). He explained:

> I accept his assessment except for his indication that the claimant had some issues dealing with work pressures and was not able to maintain persistence and pace to remember and carry out multistep instructions independently, as his own clinical evaluation findings do not support those conclusions, nor does the longitudinal record, which, as summarized in Finding 3, documented routinely normal mental status functioning even at times of mental symptomatology. As summarized above, Dr. Dubey observed that the claimant drove herself to the evaluation, arrived early, and was appropriately dressed, calm, friendly, coherent, logical, alert, responsive, and fully oriented. The claimant did not need multistep directions or multistep questions repeated, and she did not appear to have problems with comprehension. Trouble concentrating was not observed. Her recall of past experiences and recent events was normal. She displayed low average cognitive functioning. Such observations do not support the limitations Dr. Dubey indicated.

(*Id.*).

The Undersigned finds that the ALJ provided a "meaningful explanation," consistent with the Regulations, for assigning partial weight to Dr. Dubey's opinion. *See Mason*, 2019 WL 4305764, at *7. And despite Plaintiff's acknowledgment that the ALJ was not required to provide "good reasons" supporting his assessment of Dr. Dubey's opinion, (*see* Doc. 11 at 13), she still demands more than the Regulations require.

To start, Plaintiff focuses on a handful of results from Dr. Dubey's evaluation, namely, that her performance on the serial 7's test was "poor," that she reported only one out of three correct answers during a delayed recall, and that her overall intellectual level was estimated to be in the low average range. (*Id.* at 10). While these findings could arguably support Dr. Dubey's conclusion that Plaintiff could not maintain the persistence and pace necessary to remember and carry out multi-step instructions independently, the ALJ reached a different conclusion by relying

on Dr. Dubey's other findings, namely that she did not need multistep directions or questions repeated and did not have problems with comprehension, concentration, or recall. (Tr. 1228). The ALJ was well within his discretion to do so as it is the ALJ who resolves conflicts in the medical evidence and ultimately, determines what a claimant has the residual functional capacity to do at work. *See* 20 C.F.R. 404.1527(d)(2); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).

Plaintiff also faults the ALJ for comparing Dr. Dubey's opinion to other mental health records, asserting that those records are not from mental health doctors and further, that the record documents pain and fatigue, both of which would decrease her ability to maintain attention and concentration. (Doc. 11 at 12–13). But the problem for Plaintiff is that "[d]iscretion is vested in the ALJ to weigh all the evidence." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 668 (6th Cir. 2009). The ALJ recognized Plaintiff's limitations from pain and accommodated them by limiting her to a sedentary level of exertion. (Tr. 1227). Similarly, the ALJ reasonably considered the mental health findings from her primary care physicians, and noted that, at many of those exams, Plaintiff exhibited intact memory, full orientation, normal insight and judgment, and was alert and oriented. (Tr. 1221–22). The ALJ also noted that the state reviewing psychologists also found no more than mild mental functional limitations. (Tr. 1222).

In sum, despite there being no reasons-giving requirement for non-treating physician opinions, the ALJ still provided explicit and valid reasons for assigning partial weight to Dr. Dubey's opinion. Although Plaintiff may disagree with how the ALJ weighed the evidence and the opinions, she has not shown that the ALJ's analysis was outside the ALJ's permissible "zone of choice" that grants ALJs discretion to make findings without "interference by the courts." *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

## IV.     CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 11) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.     PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   March 4, 2020                              /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE